**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ORGANIZATION OF CHINESE AMERICANS, INC. D/B/A OCA-ASIAN PACIFIC AMERICAN ADVOCATES *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL DOUGLAS DAMRON, *et al.*, <br><br> Defendants. | Civil Action No. 22-178 (BAH) <br><br> Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

This case arises from a botched real estate transaction. The plaintiffs, Organization of Chinese Americans, Inc., d/b/a OCA–Asian Pacific American Advocates, and OCA Property LLC (collectively "OCA"), bring numerous state law claims against their real estate brokers and lawyers: (1) G&E Real Estate Inc., d/b/a Newmark, and its employees Michael Damron and Christopher Lucey (collectively, "the Brokers"), and (2) Mark Moorstein and his law firm, Offit Kurman P.C. and P.A. (collectively, "the Lawyers"). The Brokers allegedly misrepresented the rentable square footage of OCA's commercial property located at 18th Street N.W. in Washington, D.C., and the Lawyers allegedly committed malpractice in failing properly to advise OCA when OCA contracted to sell the property and in providing OCA conflicted representation in the ensuing litigation over that sale. Now, both groups of defendants seek dismissal of the Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6). *See generally* Defs. Brokers' Mot. Dismiss ("Brokers' Mot."), ECF No. 20; Defs. Brokers' Mem. Supp. Mot. Dismiss ("Brokers' Mem."), ECF No. 20-1; Defs. Lawyers' Mot. Dismiss ("Lawyers' Mot."), ECF No. 19; Defs. Lawyers' Mem. Supp. Mot. Dismiss ("Lawyers' Mem."),

1

ECF No. 19-1.  For the reasons explained below, the Brokers' Motion is denied, and the

Lawyers' Motion is granted in part and denied in part.

## I.     BACKGROUND

Plaintiffs are suing the professionals who brokered the 2017 sale of their historic Dupont

Circle building located at 18th Street N.W. in downtown D.C., which sale resulted in plaintiffs

receiving only two-thirds of the expected purchase price due to an apparent misunderstanding

regarding the size of the building.  In 2016, when deciding to sell the property, OCA had owned

the building for approximately ten years.  *See* Defs. Lawyers' Notice of Removal of a Civil

Action ("Not. of Removal"), Ex. A ("Compl.") ¶¶ 10, 12, ECF 1-1.  To find a buyer, OCA

retained the Brokers following discussions, in which Damron had represented that the Brokers

would work to "maximize the sale price" and "devote all of [their] resources to get [OCA] the

results [it] desire[s]."  *Id.* ¶¶ 12–13.

In December of 2016, OCA and the Brokers executed both an Exclusive Representation

Agreement and a Listing Agreement (together, the "Brokerage Agreements").[1] *Id.* ¶ 13.  The

listing agreement defined the Brokers' "Scope of Work" as including a duty to: (1) "analyze all

reasonable options and make recommendations;" (2) "provide market data;" (3) "research and

advise OCA in its negotiations with prospective purchasers;" (4) "conduct tours of the Property

with prospective purchasers;" and (5) "work with legal counsel in the negotiations requested by

---

[1]      Although plaintiffs did not attach either the Exclusive Representation Agreement or the Listing Agreement
to the Complaint nor their briefing regarding the Motions to Dismiss, *see generally* Compl., the Court may
nonetheless consider the agreements, which were attached to the Brokers' Motion to Dismiss and whose authenticity
was not challenged by plaintiffs.  A document outside the complaint may be considered on a motion to dismiss
under Rule 12(b)(6), without converting the motion to one for summary judgment, if it is "referred to in the
complaint" and is "integral to" plaintiffs' claim.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see also
Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169,
173 (D.C. Cir. 2006); *Saunders v. Mills*, 842 F. Supp. 2d 284, 293 n.2 (D.D.C. 2012); *Pearson v. District of
Columbia*, 644 F. Supp. 2d 23, 29 n.1 (D.D.C. 2009).  Here, plaintiffs' Complaint plainly references the terms of the
agreements and alleges that defendants breached those terms, *see, e.g.*, Compl. ¶¶ 13, 16, 17, 23, so these documents
may properly be considered.

OCA." *Id.* ¶ 16.  The listing agreement further laid out the Brokers' responsibilities to provide "deliverables" to OCA, including: (1) "sales and/or leasing package"; (2) "market analyses and surveys"; (3) "financial analyses"; (4) "correspondence"; (5) "requests for proposals"; (6) "letters of intent"; (7) "recommendation memoranda"; and (8) "any other work products reasonably requested by OCA." *Id.* ¶ 17.

The alleged misunderstanding as to the building's true size stemmed from the Brokers' initial actions upon their retainer.  The Brokers began their efforts by sending the property floor plans to a local architect, Justin Clark, with the request that he provide an "'estimate' of the square footage on a *pro bono* basis." *Id.* ¶ 24.  An employee of Clark provided the requested information, estimating the property to be 18,796 square feet, and explaining to the Brokers that she had based the estimate on a perimeter site review that "relied solely on PDF floor plans" of the property that the Brokers had provided. *Id.* ¶¶ 25–27.  In both her email transmitting the estimate to the Brokers and the attachment detailing her area calculations, she cautioned that the area estimates "should be verified in [the] field," noting that she attempted to measure the "interiors of each unit" only without including "demising or exterior walls," and that she "didn't have good scalable drawings of the 3rd floor" so instead copied the second-floor numbers for that floor. *Id.* ¶¶ 26–27.  Despite these caveats, the Brokers ran with the estimate, creating and distributing marketing materials stating that the property contained 18,796 *rentable* square feet, which they also provided to OCA. *Id.* ¶¶ 30–31.  The Brokers then listed the property for $9 million, once again representing that the building had 18,796 rentable square feet. *Id.* ¶ 34.  At no point did the Brokers inform OCA that the square footage estimate was of *gross* square feet as opposed to *rentable* square feet, nor did they mention any of the disclaimers the Clark employee had communicated to them. *Id.* ¶ 33.

Once buyers began approaching with offers to purchase the property, OCA engaged the services of Mark Moorstein and his firm to help with the potential sale. *Id.* ¶¶ 35–36, 52. OCA's first serious offer came from Urban Realty Advisers LLC ("URA") in March 2017. *Id.* ¶ 35. This potential sale fell through within a matter of months, however, because after investigating the size of the building itself, URA sought to reduce the purchase price by $1.25 million, explaining that "the [dollar] number [the parties] had contracted for really was based on a larger building" and that it would be "'highly unlikely' URA would be able to use the Property as it had hoped." *Id.* ¶¶ 38–39 (first alteration in original). OCA was "unwilling to agree to a building-size reduction to the purchase price," and declined URA's new offer. *Id.* ¶ 40.

Shortly thereafter, OCA entered negotiations with a second potential buyer, Richard Gersten, who initially offered $6.5 million for the property. *Id.* ¶ 43. Gersten sent the Brokers an initial draft contract, which the Brokers passed along to OCA a mere 15 minutes later with the note that "'we reviewed' it and it 'looks in order.'" *Id.* ¶¶ 45–46. The Brokers did not inform OCA that the contract described the property as containing 15,000 rentable square feet—a number that neither reflected the Broker's estimate of 18,796 gross square feet nor any other calculation known to the Brokers that would have determined the rentable square footage of the building. *Id.* ¶¶ 47–48. The Brokers likewise did not flag for OCA the fact that the contract averred that "there is no asbestos or asbestos containing material in the Building or the Property," even though this is "not a standard term for the sale of a historic property." *Id.* ¶¶ 49–50. OCA sent the draft contract to Moorstein to review as well; he likewise did not flag or propose edits to the language in the draft, but rather drafted a letter that was then sent to Gersten informing him that only "minor areas" needed "additional consideration." *Id.* ¶¶ 53–56.

4

As negotiations with Gersten progressed, edits were made to the provisions regarding the square footage and purchase price of the property that would dramatically reduce the ultimate purchase price, allegedly without either the Lawyers or the Brokers bringing those modifications to OCA's attention.  Gersten responded to Moorstein's letter forwarding a revised contract, with three critical differences from the original version.  *Id.* ¶ 57.  First, the revised contract now stated that the Property contained "approximately 18,796 rentable square feet," rather than the 15,000 number included in the original draft.  *Id.*  Second, an entirely new "price adjustment provision" was added that tied the final purchase price to the actual rentable area of the property. *Id.* ¶ 57.  In particular, this provision provided that the proposed $6.5 million purchase price was "based upon *rentable area* in the Building of 18,796 square feet," which area must be "measured by a licensed architect in accordance with the Standard Method for Measuring Floor Area in Office Buildings, 1996 ('BOMA')," and that "the Purchase Price shall be reduced" upon receipt of the BOMA measurement "based on a per rentable sq. ft. price of $346.31."  *Id.* ¶ 58.   Finally, the revised draft contained language that allowed Gersten—but not OCA—unilaterally to terminate the contract upon completion of due diligence.  *Id.* ¶ 67.  After reviewing the revised contract, neither the Brokers nor Moorstein discussed the implications of these changes with OCA.  *See id.* ¶¶ 59, 62.  In fact, Moorstein advised OCA that it was a "good agreement," advised OCA to accept the price adjustment provision, and prepared a letter to send to Gersten on OCA's behalf explaining that the latter "remain[s] pleased with" the revised contract.  *Id.* ¶¶ 62–64 (alteration in original).

While Moorstein offered some changes to the crucial provisions in the ensuing negotiations, none addressed the core issue that the $6.5 million purchase price was now premised on a square footage estimate that was unlikely to stand.  His letter to Gersten noted that

"the reduction of $346.31 per square foot is fine," provided that "the same figure is used for any increases in the square footage" as well. *Id.* ¶ 64 (emphasis omitted). While the letter went on to explain that "[i]t might be simpler . . . to leave the price alone because the building is not being sold or purchased on a per square foot basis," Moorstein seemingly did not pursue this suggestion any further and contented himself with making the purchase price adjustable in both directions, without seeking to limit the extent to which the purchase price could fall substantially below $6.5 million or to provide a reciprocal right of termination to OCA. *Id.* ¶¶ 64, 66–67. He did so, moreover, without making any inquiries "regarding whether the 18,796 estimate was based on 'gross' square footage or 'rentable' square footage," without "advis[ing] OCA regarding the potential impact of using the BOMA 1996 method for determining rentable square footage," and without "undert[aking] any inquiry to determine whether the 18,976 estimate was based on the BOMA 1996 standard." *Id.* ¶ 65.

Gersten adopted Moorstein's request to make the price adjustment provision bi-directional for the final draft of the contract, such that it now read: "If the results of such measurement shall indicate a measurement of more or less than 18,796 rentable square feet the Purchase Price shall be adjusted based upon a per rentable sq. ft. price of $346.31." *Id.* ¶ 69. Once again, upon receipt of the new draft, the Brokers did not offer any comment or analysis to either Moorstein or OCA. *Id.* ¶¶ 70–73. Moorstein opined to OCA that "because the language in the Final Draft 'works in both directions . . . this is parity and seems fair,'" still without acknowledging the risk that the existing square footage estimate would fall apart when subjected to the BOMA 1996 standard and without addressing the non-reciprocal termination rights. *Id.* ¶¶ 74–75. When pressed on the meaning of the new provision, Moorstein incorrectly explained to OCA that "more or less than 18,796 rentable square feet" "meant a 'de minimis' change of no

more than 2 or 3 percent," such that the change in price would be "no more than a few hundred thousand dollars," and that if the final measurement deviated from the original by more than 2 or 3 percent, "then the parties did not have a contract and the deal was off." *Id.* ¶ 76.  In fact, however, Moorstein should have known from the recent negotiations that the "more or less" language "was designed to address Moorstein's request for parity in the price adjustment . . . not to act as a cap on the price adjustment." *Id.* ¶ 76.  Following the advice of Moorstein and the Brokers, OCA executed a final version of the contract containing an unchanged price adjustment provision. *Id.* ¶¶ 77, 79.

Ultimately, that price adjustment provision entitled Gersten to demand a drastic reduction of the purchase price.  After closing, Gersten proceeded to measure the building according to the specified BOMA 1996 standard and found that the property consisted of only 12,855 rentable square feet—over 31% less than the estimate adopted in the contract. *Id.* ¶ 81.  He promptly informed OCA and "demand[ed] a reduction of the purchase price from $6.5 million to $4,436,631.29," citing the price adjustment provision. *Id.* ¶ 82.  Moorstein attempted to reject the reduction on the basis that "the Property's sale price was not based on the square footage of the Building and that the price adjustment provision in the [contract] contemplated only a *de minimis* adjustment, not a substantial price change," and accordingly advised OCA not to close at the reduced price. *Id.* ¶¶ 83–85.  He reassured OCA about prevailing in any ensuing litigation, because, first, "the price wasn't based on the square footage at all," and, second, any reference to square footage in the contract referred to "gross square footage" rather than "rentable square footage"—neither of which was true, under the plain terms of the contract. *Id.* ¶ 85.  In reliance on this advice, OCA refused to close the transaction at Gersten's demanded price. *Id.* ¶ 86.

When negotiations failed, Gersten sued OCA for specific performance of the contract in the Superior Court of the District of Columbia. *Id.* ¶ 87. Moorstein and his firm represented OCA in the trial, but never explained to OCA the potential conflict of interest that representation created: the weaknesses in OCA's current litigating position arose from Moorstein's prior advice in the contract negotiation and closing, and giving competent, impartial advice regarding litigation strategy would have entailed acknowledging those prior deficiencies. *Id.* ¶¶ 89–91, 97. This Moorstein was unprepared to do, instead "advis[ing] OCA that it had a strong position with respect to [Gersten] and the Litigation" and pursuing "an expensive and aggressive litigation campaign that was shaped by the Attorneys' desire to protect themselves," including pursuing a "fraudulent inducement theory" against Gersten "that was certain to fail." *Id.* ¶¶ 89, 92–94. He also "advised OCA to take unreasonably aggressive positions that prevented settlement" throughout the course of the litigation. *Id.* ¶ 96. These strategies ultimately failed: the jury found that OCA breached the PSA by failing to sell Gersten the property at the reduced price based on the rentable square footage, and the court ordered specific performance of the contract at Gersten's reduced price. *Id.* ¶ 98. Additionally, the court awarded Gersten fees and costs. *Id.* ¶ 101.

Taking into account those fees and costs—and another $150,000 credit Gersten demanded for asbestos remediation, given the express, false representation in the contract that the property contained no asbestos—all told, OCA would be out $2,842,485.62 from the $6.5 million it originally expected from the sale of the property. *See id.* ¶¶ 105–07. In addition, OCA paid Moorstein and his firm $771,722 in legal fees, "most of which was for the unsuccessful Litigation." *Id.* ¶ 108.

On December 28, 2021, plaintiffs brought this action in the Superior Court of the District of Columbia against both the Lawyers and the Brokers, alleging breach of contract, breach of fiduciary duty, professional negligence, and negligent misrepresentation against the Brokers, and legal malpractice in transaction, legal malpractice in pre-litigation and litigation, breach of fiduciary duty, and breach of contract against the Lawyers, all relating to the botched sale of the property.  *See generally id.*  The Lawyers then removed to this Court based on diversity jurisdiction.  *See* Notice of Removal, ECF No. 1.  Both groups of defendants have moved to dismiss all counts for failure to state a claim, which motions are now ripe for resolution.  *See* Brokers' Reply Supp. Mot. Dismiss ("Brokers' Rep."), ECF No. 26; Lawyers' Reply Supp. Mot. Dismiss ("Lawyers' Rep."), ECF No. 27.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *VoteVets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Consequently, "[a] complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"  *VoteVets Action Fund*, 992 F.3d at

1104 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015))
(alteration in original).

    In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint,
accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555;
*see also Atchley, v. AstraZeneca UK Limited, et al.*, 22 F.4th 204, 210–11 (D.C. Cir. 2022).
Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences
that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19
(D.C. Cir. 2015) (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d
728, 732 (D.C. Cir. 2007)).  "Threadbare recitals of the elements of a cause of action, supported
by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also id.* at 687
(explaining that a failure to allege any of a claim's elements beyond "a sheer possibility that a
defendant has acted unlawfully" results in a dismissal).  In addition, courts may "ordinarily
examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular,
documents incorporated into the complaint by reference, and matters of which a court may take
judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also
English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013); Fed. R. Civ. P. 10(c) ("A
copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all
purposes.").

## III.    DISCUSSION

    The Brokers and the Lawyers have moved separately to dismiss all four claims against
each group of defendants. As explained below, plaintiffs have sufficiently alleged all four claims
against the Brokers, and accordingly the Brokers' motion to dismiss must be denied.  As to
plaintiffs' claims against the Lawyers, two of their claims are duplicative of the remaining two

malpractice claims, and while they have plausibly established their entitlement to relief on the latter, the governing state law requires dismissal of the duplicative remainder. The Lawyers' motion to dismiss will accordingly be denied in part and granted in part.

### A.    The Brokers

The Brokers have moved, under Federal Rule of Civil Procedure 12(b)(6), to dismiss all four of plaintiffs' state law claims for breach of contract, breach of fiduciary duty, professional negligence, and negligent misrepresentation. *See* Brokers' Mem at 1.[2]

The Court addresses the sufficiency of each of plaintiffs' claims *seriatim* below.

### 1. Count I: Breach of Contract Against Newmark

In order "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Mawakana v. Bd. of Trs. of the Univ. of the District of Columbia*, 926 F.3d 859, 869 (D.C. Cir. 2019) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)) (alteration in original).

Here, plaintiffs allege that the Brokers violated the terms of their own Brokerage Agreements by failing to fulfill their obligations to "analyz[e] all reasonable options; mak[e] recommendations; provid[e] market data; research[] and advis[e] OCA in its negotiations with prospective purchasers; conduct[] tours of the Property with prospective purchasers; work[] with legal counsel in negotiations; and provid[e] weekly reports concerning efforts to market the Property," all while "ensur[ing] that any information provided to OCA and to potential purchasers pursuant to its obligations under the Brokerage Agreements was accurate," pursuant to the ordinary standard of care applicable to brokers in the industry. Compl. ¶¶ 112–13.

---

[2]    District of Columbia law governs the Brokers' state law claims in this diversity case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012).

Neither the validity of the Brokerage Agreements nor the existence of these duties is disputed. *See* Broker's Mot., Ex. 1 ("Listing Agreement") at 1, ECF No. 20-2; Brokers' Mem. at 3–4 (explaining the Brokerage Agreements as imposing the same obligations as recounted in plaintiffs' Complaint).

The Brokers focus their arguments on plaintiffs' establishment of the third element for a contract claim, arguing that plaintiffs' only theories of breach are that the Brokers failed to obtain a precise measurement of the rentable square footage of the property and that they failed to provide legal advice regarding the price adjustment provision in the property sale agreement, but that the Brokerage Agreements never imposed these specific duties. Brokers' Mem. at 9–13. As plaintiffs correctly assert, this argument "cherry-pick[s] allegations from the Complaint and entirely ignore[es] others" an in "overly-narrow framing" of the relevant contract. Pls.' Opp'n Defs. Brokers' Mot. Dismiss ("Pls.' Opp'n to Brokers' Mot.") at 14, ECF No. 25.

Contrary to the Brokers' portrayal of the breach of contract claim, the complaint lays out several explicit obligations imposed by the Brokerage Agreements, many of which plaintiffs allege the Brokers breached. For example, plaintiffs specifically allege that the relevant contract obligated the Brokers to "advis[e] OCA in its negotiations with prospective purchasers" and "work[] with legal counsel in negotiations," Compl. ¶ 112, and yet that during the negotiations with Gersten the Brokers never informed either OCA or the Lawyers that the 18,796 square footage figure, which originated with the Brokers and was included in the final version of the property sale agreement, was not obtained in accordance with the BOMA 1996 standard and thus was likely to result in a price adjustment under the provision as written, *id.* ¶ 71. The latter allegations amount to a breach of the former. *See Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 130 F. Supp. 3d 236, 262 (D.D.C. 2015) ("[T]o state a claim for breach of contract so

as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." (quoting *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)).  Plaintiffs do not need to allege that the Brokerage Agreements required the Brokers to obtain the area measurements in any particular way or provide legal advice beyond the Brokers' professional expertise; they have alleged other specific duties under the contract that the Brokers failed to perform, and the Brokers do not attempt to grapple with these allegations.

As to the final requirement of damages, plaintiffs' allegations allow the "reasonable inference" to be drawn, *see Iqbal*, 556 U.S. at 678, that they would not have signed the property sale agreement had the Brokers fulfilled their contractual obligations to provide all the relevant information regarding the property and to assist OCA and the Lawyers in the negotiations, which would have alerted plaintiffs to the dangers of the purchase price adjustment provision as-written in the final sale.  *See* Compl. ¶¶ 69–73, 77–78.

Accordingly, the Brokers' motion is denied as to plaintiffs' breach of contract claim set out in Count I.

### 2. Counts II and III: Breach of Fiduciary Duty and Professional Negligence Against Damron, Lucey, and Newmark

Plaintiffs next bring claims, in Counts II and III, for breach of fiduciary duty and professional negligence, respectively, against defendants Damron, Lucey, and Newmark.  Both claims are predicated on the same underlying conduct, *see* Compl. ¶¶ 121–22 (breach of fiduciary duties), 125–26 (professional negligence), and because the law governing these two causes of action is similar, they are properly analyzed together.  *See, e.g.*, *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 74 (D.D.C. 1998); *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 78 (D.D.C. 2015); *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d

33, 44–45 (D.D.C. 1010); *In re Belmar*, 319 B.R. 748, 752–53 (D.D.C. Bankr. 2004); *Mills v. Cooter*, 647 A.2d 1118, 1120 n.6 (D.C. 1994).

To prevail on "a claim for breach of fiduciary duty under District of Columbia law, a plaintiff must allege facts sufficient to establish: (1) the defendant owed plaintiff a fiduciary duty; (2) a breach of that duty; and (3) proximate cause and injury to be inferred from those facts." *Xereas v. Heiss*, 987 F.3d 1124, 1130 (D.C. Cir. 2021). The elements of a claim of professional negligence are the same, except the duty element must be established by allegations that defendants owed plaintiffs a duty to use "such skill, prudence, and diligence as other members of [their] profession commonly possess and exercise." *Shapiro, Lifschitz & Schram*, 24 F. Supp. 2d at 75. Here, plaintiffs sufficiently allege each of these elements for both claims.

First, District of Columbia law is clear that real estate brokers are fiduciaries of their clients. *See Vicki Bagley Realty, Inc. v. Laufer* 482 A.2d 359, 364 (D.C. 1984) ("A real estate broker, like any other agent, owes a fiduciary duty to his principal.") (citations omitted). "The fiduciary duty owed by a real estate agent . . . requires the exercise of the highest fidelity toward the principal. It encompasses an obligation to inform the principal of every development affecting his interest . . . ." *Id.* at 364–65; *Jenkins v. Strauss*, 931 A.2d 1026, 1032–33 (D.C. 2007). The Brokers' fiduciary duties are also animated by D.C. statutory law, which requires brokers to "exercise ordinary care," D.C. Code § 42-1703(a)(1)(D), and to "disclos[e] to the seller material facts related to the property or concerning the transaction of which the licensee has actual knowledge." *Id.* § 42-1703(a)(1)(B)(iii). A "material fact" is "information that, if known, would be likely to induce a reasonable person to enter into or not enter into or consummate a real estate transaction." *Id.* § 43-1702(7B). Additionally, a real estate broker is required to "perform in accordance with the terms of the brokerage relationship," *see id.* § 42-

14

1703(a)(1)(A), which is defined as "the contractual relationship between a client and a real estate [broker] . . . ." § 42-1702(2A).  Thus, the fiduciary duties owed by real estate agents are set by statute and modified by the contractual agreement of the parties, precisely as alleged in plaintiffs' Complaint.  *See* Compl. ¶¶119–20.

That the Brokers owed plaintiffs a duty to use the skill, prudence, and diligence commonly employed by members of their profession is likewise straightforwardly established. The generally applicable "duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes," for "it is this notion of specialized knowledge and skill which animates the law of professional negligence." *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979).  Plaintiffs therefore sufficiently allege that the Brokers, in their capacity "[a]s OCA's real estate brokers and representatives in the sale of the Property,  . . . owed OCA a duty to exercise the reasonable care, skill, and diligence as is ordinarily possessed by brokers engaged in the same or similar business."  Compl. ¶ 125.

Plaintiffs also sufficiently allege that the Brokers did not live up to the high bar imposed by their status as fiduciaries and did not exercise ordinary professional care, most notably by failing to act in OCA's best interests in obtaining and using the square footage measurement and in failing to disclose to plaintiffs all material facts they knew regarding that measurement.  *Id.* ¶ 121.  Instead of hiring a professional to measure plaintiffs' property, defendants asked a local architect to "estimate" the size of the property and specifically asked that he do so on a *pro bono* basis. *Id.* ¶ 24.  The Brokers had reason to question the reliability of the resultant 18,796 square feet figure in light of the disclaimers and caveats expressed by the architect's employee regarding her estimate, *id.* ¶ 26, yet they did not communicate those deficiencies to plaintiffs nor proceed as if the square footage figure was merely a rough estimate.  Instead, they ran with the

number, creating multiple marketing materials advertising that the property contained 18,796 rentable square feet, and never raising the fact that this was a rough approximation even when the exact figure was incorporated into potential sale agreements. *See id.* ¶¶ 30–34, 37, 58–61, 71.[3]  Notwithstanding the Brokers' conclusory assertions that they "exercised the ordinary care expected of real estate brokers under these circumstances," Brokers' Mem. at 14, these alleged actions were inconsistent with their fiduciary and professional duties to act in plaintiffs' best interests and to disclose to them all known material facts.

Finally, plaintiffs adequately allege that the Brokers' breach of their applicable duties proximately caused them injury.  In the final property sale agreement, the purchase price was directly tied to the rentable square footage, and the final price was reduced by over $2 million when the area as determined under the BOMA 1996 standard fell far below the Brokers' rough estimate.  Compl. ¶¶ 81–82.  It is reasonable to infer that plaintiffs would not have signed an agreement with such an unfavorable purchase price adjustment provision if the Brokers had acted in plaintiffs' best interests in obtaining the area measurement and communicated all known material facts regarding that measurement, and thus that the Brokers proximately caused plaintiffs' injury.  Compl. ¶ 122.

As such, the Brokers' motion is denied with respect to plaintiffs' breach of fiduciary duty and professional negligence claims set out in Counts II and III.

---

[3]     The Brokers, in support of their motion to dismiss, seemingly contest many of these factual allegations, arguing that "the information the Plaintiffs allege they did not know was, in fact, known to them" and that the Brokers provided all the required disclosures and advice—all of which plaintiffs continue to vehemently deny.  *See* Brokers' Mem. at 15–16; Pls.' Opp'n to Broker's Mot. at 24–25.  Such refutation of the well-pleaded factual matter of plaintiffs' complaint, however, cannot be credited at this stage of the litigation.  *See, e.g.*, *Richards v. Gelsomino*, 240 F. Supp. 3d 173, 179 (D.D.C. 2017) ("[A] motion to dismiss is not the proper vehicle for [resolving factual disputes]."); *see also Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor." (citing *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014))).

### 3. Counts IV: Negligent Misrepresentation Against Damron, Lucey, and Newmark

Plaintiffs' final claim against the Brokers is one for negligent misrepresentation.  To prevail on a claim for negligent misrepresentation, plaintiffs "must show (1) that the defendant made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that the plaintiff[s] reasonably relied upon the false statement or omission to [their] detriment."  *Heyer v. Schwartz & Assocs. PLLC*, 319 F. Supp. 3d 299, 306 (D.D.C. 2018) (quoting *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015)).

Here, plaintiffs have sufficiently alleged that they reasonably relied on the Brokers' representation that the building was approximately 18,796 square feet, when in fact the property was roughly two-thirds that size—a fact that ended up being highly material in the sale of the property under the purchase price adjustment provision—and that they lost a substantial amount of money as a result of that reliance.  The complaint alleges that multiple material facts were not disclosed by the Brokers to plaintiffs regarding the area measurement, including that this figure was merely an estimate done on a *pro bono* basis, that the individual who had provided the estimated square footage also provided several caveats to that number and advised the Brokers to verify the number, and that the estimate did not reflect rentable square footage in accordance with the BOMA 1996 standard per the terms of the final purchase agreement.  *See* Compl. ¶¶ 24–33, 129–30.  The Brokers counter that their failure to provide these specifics could not have amounted to material omissions, because plaintiffs were generally "aware that the rentable square footage was not an exact measurement and was only an approximation" and because they never made affirmative misrepresentations about the size of the rentable space.  *See* Brokers' Mem. at 16–17.  Such an argument significantly understates the nature of the Brokers' duty not to omit material facts to plaintiffs.  Where, as here, defendants are fiduciaries, the duty to

17

disclose is heightened.  *See Vicki Bagley*, 482 A.2d at 364–65 ("The fiduciary duty owed by a

real estate agent . . . requires the exercise of the highest fidelity toward the principal.  It

encompasses an obligation to inform the principal of *every development affecting his*

*interest . . . .*" (citations omitted) (emphasis added)).  As such, the Brokers had a duty to disclose

the specific details of the nature of the area measurement, including the limitations of the

estimate as had been expressly communicated to them and the potential that the estimate could

differ significantly from the purchase agreement's description of the same number as

representing the rentable square footage in accordance with the BOMA 1996 standard—all of

which affected plaintiffs' interests in the sale of the property.  Even if plaintiffs knew that the

measurement of 18,796 square feet was an approximation, they have plausibly alleged that they

did not know the aforementioned details, *see* Compl. ¶¶ 30–33, 129, and thus would have

reasonably concluded that the provided figure was significantly closer to that included in the

final purchase agreement than it in fact was.  As such, the undisclosed details were material, and

given the Brokers' status as fiduciaries, plaintiffs were not unreasonable in relying on the

representations that omitted these facts.  *See Coon v. Wood*, 68 F. Supp. 3d 77, 86 (D.D.C. 2014)

("Where a real estate agent—experienced in a specific type of transaction—makes an affirmative

representation to the principal regarding that same type of transaction, the principal is not

unreasonable as a matter of law to rely upon the representation.").

Accordingly, the Brokers' motion is denied with respect to plaintiffs' professional

negligence claim set out in Count IV.

B.      The Lawyers

The Lawyers have moved, under Federal Rule of Civil Procedure 12(b)(6), to dismiss all

four of plaintiffs' state law claims for legal malpractice in transaction, legal malpractice in pre-

litigation and litigation, breach of fiduciary duty, and breach of contract.  Lawyers' Mem. at 3.

As a threshold matter, the applicable state law as to the claims against the Lawyers is

Virginia—not the District of Columbia—because of a choice-of-law provision in the retainer

agreement entered by the Lawyers and plaintiffs.  The retainer agreement, signed by Moorstein

and the CEO of OCA, expressly incorporated the law firm's standard "terms and conditions," a

provision highlighted on the one-page agreement with markings in bold and italic lettering, with

further directions that those terms and conditions were available both online and "in hard copy at

[] request."  Lawyers' Mot., Ex. A ("Retainer Agreement"), ECF No. 19-4.  Those terms and

conditions include a choice-of-law provision, which sets out that "all . . . claims, disputes, and

actions related to, or arising out of [a client's engagement of Offit Kurman] shall be governed by

the laws of the Commonwealth of Virginia."  Retainer Agreement at 4.

Under District of Columbia law, which "supplies the applicable choice-of-law standard"

in this diversity case, *Sickle v. Torres Advanced Enter. Sols., LLC.*, No. 11-cv-2224 (KBJ), 2020

WL 5530357, at *7 (D.D.C. Sept. 14, 2020) (quoting *Williams v. First Gov't Mortg. & Invs.

Corp.*, 176 F.3d 497, 499 (D.C. Cir 1999)), the choice-of-law provision is enforceable.  "[C]ourts

[can] enforce express contractual choice-of-law provisions 'so long as there is some reasonable

relationship with the state specified.'"  *Id.* (quoting *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391,

1394 (D.C. Cir. 1995)).  Here, the dispute bears a "reasonable relationship" with Virginia

because plaintiffs' claims arise from their retention of Moorstein and his firm, and Moorstein

resides and practices out of his firm's office in Virginia.  Compl. ¶ 7; Retainer Agreement at 1.

"District of Columbia courts routinely find that" a state is "reasonably connected to the contract" where, as here, one of the parties to the contract is headquartered in, does business in, or is a resident of that state.  *See Sickle*, 2020 WL 5530357 at *7; *Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011); *Orchin v. Great-W. Life & Annuity Ins. Co.*, 133 F. Supp. 3d 138, 146–47 (D.D.C. 2015); *cf. PCH Mut. Ins. Co., Inc. v. Casualty & Sur., Inc.*, 569 F. Supp. 2d 67, 72 (D.D.C. 2008) (concluding that a contract's purported choice of California law was unenforceable where "no portion of the Agreement was to be performed in California, neither of the parties is based in California, [plaintiff] does not do business in California and is not qualified to do so, and [defendant] did not even qualify to do business in California" at the time of signing the contract).  Moorstein signed the retainer agreement in his capacity as a lawyer practicing out of a Virginia law office and, thus, Virginia is reasonably connected to that agreement.

Plaintiffs cannot avoid this result by contending that "no true conflict exists" between District of Columbia law and Virginia law and that District of Columbia law has the greater relationship to the dispute—for these are considerations where there is no enforceable choice-of-law provision and more than one jurisdiction has a potential interest in having its law applied. *See, e.g.*, *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51–55 (D.C. Cir. 2015); *Signature Tech. Sols. v. Incapsulate, LLC*, 58 F. Supp. 3d 72, 80 (D.D.C. 2014).  Here, a valid choice-of-law provision is contained in the Lawyers' retainer agreement and, therefore, Virginia law will govern OCA's claims against the Lawyers, which claims relate to a dispute arising from the Lawyers' services under that agreement.  Those claims will now be addressed in turn.

### 1. Count V:  Legal Malpractice in Transaction Against Moorstein and Offit Kurman

Plaintiffs' first cause of action against the Lawyers is for legal malpractice in transaction. To prevail on a claim of legal malpractice under Virginia law, a plaintiff must establish "the existence of an attorney-client relationship which gave rise to a duty, breach of that duty by the defendant attorney, and that the damages claimed by the plaintiff client must have been proximately caused by the defendant attorney's breach." *Shipman v. Kruck*, 267 Va. 495, 501 (Va. 2004) (quoting *Rutter v. Jones, Blechman, Woltz & Kelly, P.C.*, 264 Va. 310, 313 (Va. 2002); *Desetti v. Chester*, 290 Va. 50, 56 (Va. 2015) (same).

Plaintiffs have pleaded sufficient facts in the Complaint to state a claim for legal malpractice.  Plaintiffs contend that, as a part of the parties' undisputed attorney-client relationship, the Lawyers owed them—and subsequently breached—a duty of reasonable care by failing to protect OCA's interests during the negotiation of the sale of the 18th St. NW property. Compl. ¶¶ 136–39.  In particular, plaintiffs state that the Lawyers failed to: (1) "[d]raft or propose changes to the PSA to ensure that the PSA accurately reflected OCA's intentions and minimized OCA's risks"; (2) "[c]onduct adequate inquiry into key terms of the PSA, including how the 18,796 square footage estimate was calculated and the BOMA 1996 standard's potential impact on price"; and (3) "[p]rovide competent advice regarding the risks of the PSA draft language." *Id.* ¶ 138.  Further, "Moorstein failed to recommend changes to the Final Draft that would have protected OCA's expectation that it would receive $6.5 million for the Property, or that would have allowed OCA to terminate the agreement and find another purchaser if the price adjustment was more than a de minimis amount." *Id.* ¶ 74.

Plaintiffs have also sufficiently alleged damages proximately caused by the Lawyers' failure to properly advise and defend plaintiffs' interests.  In reliance on the advice of

defendants, plaintiffs signed the PSA, which resulted in them being forced to sell the property for over $2 million less than their expected price. *See id.* ¶ 77. Construing the factual allegations in favor of plaintiffs allows for a "reasonable inference," *Iqbal*, 556 U.S. at 678, that had the Lawyers not misadvised them, plaintiffs would have refused to sign the purchase agreement absent terms that better protected their interests, such as a reciprocal termination right if the price adjustment provision resulted in too drastic a reduction based on the square footage. Thus, plaintiffs allege sufficient facts at this pleading stage to state a claim for transactional legal malpractice.

The Lawyers counter that the root of plaintiffs' claim is that the rentable square footage estimate in the sale contract was inaccurate—a misrepresentation for which Brokers, not the Lawyers, were responsible. As a result, they argue that they were not the proximate cause of the harm because "[b]y the time the Offit Kurman Defendants were retained, the Brokers had already obtained a measurement of the Building." Lawyers' Mem. at 13–14, 17–20. Relatedly, they present as a separate argument the fact that OCA hired the Brokers as independent contractors before separately hiring the Lawyers and that the Lawyers therefore cannot be said to have exerted control over the Brokers such that they are responsible for the latter's actions. *Id.* at 13–16. Both arguments ignore plaintiffs' many other factual allegations regarding malpractice in negotiating and closing the property sale that have nothing to do with the initial measurement of the property, including the Lawyers' failure to negotiate for reciprocal termination rights, to make any inquiries as to the risks of the price adjustment provision and its imposition of the BOMA 1996 standard, and to explain correctly the meaning of the price adjustment provision in response to plaintiffs' inquiries. "There may be more than one proximate cause of an event," *Westlake Props., Inc. v. Westlake Pointe Prop. Owners Ass'n, Inc.*, 273 Va. 107, 125 (Va. 2007),

and this is precisely what plaintiffs allege here.  The fact that the Brokers' allegedly inadequate initial efforts to measure the property may have proximately caused plaintiffs' harm does not mean that the Lawyers' actions were thereby immunized from liability.

The Lawyers' final argument is that both malpractice claims should be dismissed because plaintiffs "failed to plead the case within the case," Lawyers' Mem. at 14, 20–22, but this is entirely inapposite to the transactional malpractice claim.  "A legal malpractice action usually involves a 'case within the case,' in which the plaintiff must present evidence that would have been presented in the underlying action," *Williams v. Joynes*, 278 Va. 57, 62 (Va. 2009) (quoting *Whitley v. Chamouris*, 265 Va. 9, 11 (Va. 2003)), but such an analysis plainly does not apply when the type of attorney negligence alleged is something other than negligence in conducting litigation.  Here, plaintiffs' claim has to do with the Lawyers' negligence in representing plaintiffs in negotiating and closing the property sale, and as discussed *supra*, they have adequately pleaded the elements of that transactional malpractice claim.  *See, e.g.*, *Musselman v. Willoughby Corp.*, 230 Va. 337, 343–44 (Va. 1985) (analyzing a transactional malpractice claim without requiring consideration of a "case within a case").

Accordingly, the Lawyers' motion to dismiss Count V will be denied.

### 2. Claim VI:  Legal Malpractice in Pre-Litigation and Litigation Against Moorstein and Offit Kurman

Plaintiffs' second claim against the Lawyers is also for legal malpractice, this time in pre-litigation and litigation, the elements for which claim are already set forth, *supra* in Part III.B.1. The allegations made to support this claim are sufficiently plausible to withstand a motion to dismiss.

As to litigation malpractice, plaintiffs contend that the Lawyers breached their duty of care arising out of their undisputed attorney-client relationship by failing to advise plaintiffs of

the Lawyers' conflict of interest that arose when OCA refused to pay Gersten the reduced purchase price at the Lawyers' advice, and Gersten then sued for specific performance of the contract.  Specifically, plaintiffs explain that because Moorstein and his firm had an interest in covering up the inadequate advice they had provided in the negotiation and closing of the contract (for which they were "vulnerable to a potential claim of legal malpractice," as has been addressed, *supra* in Part III.B.1), the Lawyers allegedly misled plaintiffs as to the strength of their litigating position and their viable arguments in the subsequent suit and its settlement opportunities.  *See* Compl. ¶¶ 89–97, 147.  According to plaintiffs, the Lawyers had a duty to advise plaintiffs of the existence of the conflict so that plaintiffs could have considered retaining independent counsel in negotiating the fallout of the botched property sale, but the Lawyers failed to do so.  *Id.* ¶¶ 90–91, 144–47.  Finally, plaintiffs allege that this breach caused them damages, in that the Lawyers' choice not to mention the conflict and instead to lead plaintiffs through litigation, which plaintiffs otherwise could have avoided or reasonably settled, needlessly magnified the total cost.  *See id.* ¶¶ 91, 96, 108.  These allegations sufficiently state the required elements of the litigation malpractice claim.

The Lawyers' only argument relevant to this claim is that plaintiffs have inadequately pleaded the "case within the case" by explaining how they would have "prevailed in the underlying action" absent the Lawyers' breach, Lawyers' Mem. at 20–22, but this vastly overstates the requirements of proximate cause in this context.  Plaintiffs never allege that they would have won the contract suit against Gersten outright had the Lawyers properly advised them; rather, they claim that had they been informed of the Lawyers' conflict of interest and obtained the advice of independent counsel, they would have been informed of the weaknesses of their legal position under the plain terms of the contract, and thus would have known to avoid

the litigation entirely or to engage in meaningful settlement talks sooner.  *See* Compl. ¶¶ 108,

147.  Where this is the theory of litigation malpractice, the correct inquiry for the "case within

the case" is not whether plaintiffs would have prevailed outright in the underlying litigation, but

whether plaintiffs would indeed have obtained the more favorable outcomes of altogether

avoiding the litigation or settling for a lower overall payment.  *See, e.g.*, *Rahbar v. L. Off. of*

*Arquilla & Poe, PLC*, No. 18-cv-1475 (LMB/MSN), 2019 WL 1575191, at *9 (E.D. Va. Apr.

11, 2019) (explaining that to establish the "case within the case," "the plaintiff must present

sufficient evidence with respect to the subject of the underlying legal representation 'to convince

the trier of fact . . . that, in the absence of the attorney's alleged negligence, the plaintiff would

have prevailed'—*or at least obtained a measurably better result*—'in the underlying action'"

(quoting *Williams*, 278 Va. at 62) (emphasis added)).  Plaintiffs adequately allege the latter

theory here, so the fact that they do not attempt to establish that they would have won the

contract litigation absent the Lawyers' malpractice is not fatal to their litigation malpractice

claim.

       Accordingly, the Lawyers' motion to dismiss Count VI will be denied.

### 3. Counts VII and VIII:  Breaches of Fiduciary Duty and Contract Against Moorstein and Offit Kurman

       Plaintiffs' final claims against the Lawyers, for breach of fiduciary duty and breach of

contract, must fail.  Virginia law treats such claims as redundant with legal malpractice claims

arising from the same contract for legal services.  *See Gen. Sec. Ins. Co. v. Jordan, Coyne &*

*Savits, LLP*, 357 F. Supp. 2d 951, 961–62 (E.D. Va. 2005) (explaining that contract and fiduciary

duty claims must fail where "[t]he breach alleged in both the breach of contract and breach of

fiduciary duty claims is the same failure to provide adequate legal services that is the crux of the

legal malpractice claims").  "No matter how the undertaking to exercise ordinary skill and

25

knowledge is characterized, the essential claim is for legal malpractice," MALLEN & SMITH, 1

LEGAL MALPRACTICE § 8.1, at 769–70, and so these "separately pleaded tort claims are

duplicative of plaintiffs legal malpractice claim and must be dismissed," *Rahbar*, 2019 WL

1575191, at *8.  *See also Doe v. Rawls L. Grp., P.C.*, No. 20-cv-669, 2022 WL 658557, at *3–4

(E.D. Va. Mar. 4, 2022) (same); *Shortt v. Immigr. Reform Law Inst.*, No. 11-cv-144, 2011 WL

4738657, at *2 (E.D. Va. 2011 Oct. 3, 2011) (same).

Accordingly, the Lawyers' Motion to Dismiss will be granted as to Counts VII and VIII.

## IV.    CONCLUSION

For the foregoing reasons, defendants' Motions to Dismiss the Complaint are granted in

part and denied in part.  Specifically, the Brokers' Motion to Dismiss the Complaint is denied

with respect to plaintiffs' claims for breach of contract, breach of fiduciary duty, professional

negligence, and negligent misrepresentation.  The Lawyers' Motion to Dismiss the complaint is

denied with respect to plaintiffs' claims for legal malpractice in transaction and legal malpractice

in pre-litigation and litigation, but granted as to plaintiffs' claims for breach of fiduciary duty and

breach of contract, and those claims are dismissed with prejudice.

An order consistent with this Memorandum Opinion will be filed contemporaneously.


DATE: March 1, 2023


                            _____

                            BERYL A. HOWELL
                            Chief Judge